**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **QUALITY STONE VENEER, INC.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | |
| **SELECTIVE INSURANCE** | : | |
| **COMPANY OF AMERICA,** | : | **NO. 15-6509** |
| | : | |
| **Defendant.** | | |

**M E M O R A N D U M**

STENGEL, J.                                                   **January 23, 2017**

## I.     INTRODUCTION

This is an insurance coverage dispute between the plaintiff, Quality Stone Veneer,

Inc. ("QSV") and its insurance company, Selective Insurance Company of America

("defendant"). Both parties filed motions for summary judgment disputing whether the

defendant has a duty to defend QSV in an underlying state-court action in which QSV

has been sued. For the following reasons, I find that the defendant has no duty to defend

QSV.

## II.     BACKGROUND

QSV is a company that installs and manufactures stone veneer. (Dec. Judg.

Compl., Doc. No. 1 at 19 ¶ 16) [hereinafter "DJ Compl."]. In 2003, QSV entered into a

subcontract with Mignatti Construction for the development of an apartment complex

called Heritage Creek Condominium in Warwick Township, Pennsylvania. (Id. ¶ 17).

Under this subcontract, QSV agreed to provide all the materials and labor related to the

installation of stone veneer at the condominium construction project. (Def.'s Concise Statement Undisputed Material Facts, Doc. No. 11-4 ¶ 19) [hereinafter "DSUMF"].

In 2006, after construction had begun, the Heritage Creek Condominium Association filed a complaint against Mignatti Construction in Pennsylvania state court. (Id. ¶ 21). It alleged claims against Mignatti for "serious fire, life and safety deficiencies in the construction of the furnace, ventilation, roofing, alarms, sprinklers, electrical and water systems" at Heritage Creek Condominium. (Underlying Compl., Doc. No. 1-4 at ¶ 29). Mignatti thereafter filed a joinder complaint against QSV for "contribution and/or indemnity breach of warranty/negligence." (Am. Joinder Compl., Doc. No. 12-7 at 11).

The defendant has refused to defend QSV in the underlying action. Defendant's refusal to defend QSV prompted QSV to file the instant declaratory judgment action in the Court of Common Pleas of Lancaster County. (Doc. No. 1 at 16).[1] I must now decide whether defendant has a duty to defend QSV. This requires consideration of the underlying action, the terms of QSV's commercial general liability policy with defendant, and the present action.

A.      *The Underlying Action*

After the work was completed at Heritage Creek Condominium, the Heritage Creek Condominium Association hired an engineering company to perform an inspection of the condominium. (Doc. No. 1-4 at 23 ¶ 28). The purpose of this inspection was to determine whether the condominium "was constructed in accordance with the architectural drawings and all applicable zoning and building regulations and other

---

[1] On December 9, 2015, defendant removed the action to this court.

requirements." (Id.) The engineering company performed the inspection and then made a report documenting its findings on February 16, 2005. (Id. ¶ 29). The report listed deficiencies in how the ventilation, roofing, alarms, furnace, sprinklers, electrical, and water systems were constructed. (Id.)

The engineering company performed a second inspection on January 26, 2006. (Id. ¶ 37). The report for this inspection stated that many of the above deficiencies had not been corrected by Mignatti. (Id.) Thereafter, the Heritage Creek Condominium Association filed a complaint against Mignatti in the Court of Common Pleas of Bucks County. Heritage Creek Condominium Association amended its complaint on June 5, 2006. (Id. ¶ 1). This amended complaint alleged "deficiencies . . . in the construction" of certain parts of the condominium. (Id. ¶ 29). Specifically, it claimed Mignatti had failed to construct the condominium as required by contract specifications, bylaws, building codes, and zoning ordinances. (Id. ¶ 46).

As the case against Mignatti proceeded through discovery, Heritage Creek Condominium Association had several more inspections done on the property. One of these inspections resulted in a report, which opined that Mignatti had failed to properly install: (i) flashing in and around the condominium's balconies; (ii) weather resistant barriers; (iii) windows; and (iv) balcony base plates. (Doc. No. 12-7 at 7 ¶ 16). According to the report, this caused water infiltration in the condominiums. (Id. ¶¶ 14, 17). A different report claimed that Mignatti "failed to properly install the adhered masonry concrete veneer and windows on the Project, which has caused water to infiltrate and

damage the Condominium." (Id. ¶ 22). These inspections and reports were completed in 2012 and 2013.

About one year after these reports, Mignatti filed a joinder complaint against QSV and others, which Mignatti amended on September 29, 2014. (Id. at 18). In the amended joinder complaint, Mignatti alleged that "[a]ny breach of a legal duty or negligence or breach of warranty with respect to [QSV]'s work was that of [QSV] and not [Mignatti]." (Id. at 11 ¶ 46). Mignatti relied on its subcontract agreement with QSV, which required QSV to "make good . . . any defect in material or workmanship which may occur or develop." (Id. ¶ 48). Mignatti also denied liability for any "alleged construction defects and design defects and for alleged failures in construction monitoring." (Id. ¶¶ 23–24). The amended joinder complaint sought contribution and indemnity from QSV for any damages resulting from "the work performed, materials furnished or services provided" by QSV. (Id. ¶ 50).

### B.     The Insurance Policy

Defendant provided an insurance policy to QSV from 2003 to 2008. The policy contained both commercial general liability ("CGL") coverage as well as umbrella liability coverage.[2]

---

[2] Umbrella liability coverage is a type of "excess" insurance. Scott M. Seaman & Charlene Kittredge, *Excess Liability Insurance*, 32 TORT & INS. L.J. 653, 654 (1997). Excess insurance is different from primary insurance. Id. An insured usually obtains one level of "primary" insurance coverage that is followed by one or more layers of "excess" insurance. Id. at 654–55. A primary insurance policy applies immediately upon the happening of an "occurrence." Id. at 655. The excess insurance policy, such as an umbrella policy, only applies after the limits of the primary insurance policy have been exhausted. Id. For example, if an insured purchases a $200,000 primary insurance policy and reaches a settlement for $250,000 with a third party, then ordinarily the insurer is not obligated to cover the excess $50,000. With an excess policy, however, that extra $50,000 could potentially be covered.

The CGL policy provides coverage for bodily injury and property damage as follows: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which the insurance applies." (Doc. No. 11-3 at 21). The CGL policy only provides coverage if the bodily injury or property damage results from an "occurrence." (Id.) The CGL policy, in turn, defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Id. at 35).

The umbrella policy provides QSV with excess coverage over and above the CGL policy limits under certain circumstances. Just like the CGL policy, the umbrella coverage is only activated when there is bodily injury or property damage as the result of an "occurrence." (Id. at 56). The umbrella policy defines an "occurrence" the same way that the CGL policy does: "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Id.)

The CGL policy contains numerous exclusions.[3] (Doc. No. 12-1 at 71–74). One of these exclusions relates specifically to damage to QSV's own work. It states that coverage does not apply to:

> l.    Damage To Your Work
>
> "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

---

[3] An exclusion is a condition that, if present, relieves the insurer of its obligation to provide coverage. Devcon Internat'l Corp. v. Reliance Ins. Co., 609 F.3d 214, 882–83 (3d Cir. 2010).

> This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

(Id. at 74).[4] The CGL policy contains an aggregate limit of $2,000,000 for products-completed operations. (Id. at 58). The CGL policy also contains an exclusion for "impaired property." (Id. at 74). The impaired property exclusion precludes coverage for certain property damage. (Id. at 74, 83).

### C.    The Present Action

After QSV was sued by Mignatti in state court, it sought coverage from defendant. Defendant denied coverage, claiming it had no duty to defend QSV in the underlying action. (Doc. No. 1 at 22 ¶¶ 33–34). QSV then filed the instant declaratory judgment action seeking coverage under the CGL policy. QSV contends that defendant has a duty to defend, while defendant argues the opposite.[5]

---

[4] The policy goes on to define "products-completed operations hazard" as follows: "all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work' . . . ." The products-completed operations hazard does not include bodily injury or property damage that arises out of:

    (1)  The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

    (2)  The existence of tools, uninstalled equipment or abandoned or unused materials; or

    (3)  Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

(Doc. No. 12-1 at 84–85).

[5] "The duty to defend is a distinct obligation, different from and broader than the duty to indemnify." Sikirica v. Nationwide Ins. Co., 416 F.3d 214, 225 (3d Cir. 2005). Thus, "[b]ecause the duty to defend is broader than the duty to indemnify, there is no duty to indemnify if there is no duty to defend." Id. With these principles in mind, the parties requested to brief the duty to defend before addressing the duty to indemnify. (Doc. No. 11-1 at 3–4); (Doc. No. 10-1 at 5).

### III.    LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is "material" only if it might affect the outcome of the case.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  <u>Id.</u>

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing relevant portions of the record, including depositions, documents, affidavits, or declarations, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c).  Summary judgment is therefore appropriate when the non-moving party fails to rebut the moving party's argument that there is no genuine issue of fact by pointing to evidence that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Celotex</u>, 477 U.S. at 322.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must draw "all justifiable inferences" in favor of the non-moving party.  <u>Anderson</u>, 477 U.S. at 255.  The

Court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id. at 252.  It is well established that in Pennsylvania the interpretation of an insurance contract is a question of law. Kvaerner Metals Div. v. Commercial Union Ins. Co., 908 A.2d 888, 897 (Pa. 2006). In determining whether an insurer has a duty to defend, the court shall consider only the language of the policy and the complaint against the insured. Id. at 896–97.

## IV.    DISCUSSION

The outcome of the instant motions turns on the resolution of one question: Was the property damage alleged in the underlying action the result of an "occurrence" as defined by the CGL policy? If it was, then coverage applies and defendant must defend QSV. If it was not, then there is no coverage and defendant has no duty to defend.

### A.    *Duty to Defend*

Under Pennsylvania law, an insurer has a duty to defend the insured if the complaint in the underlying action against the insured potentially comes within the policy's coverage. Sikirica, 416 F.3d at 225.[6] The duty to defend is distinct from and broader than the duty to indemnify. Ramara, Inc. v. Westfield Ins. Co., 814 F.3d 660, 673 (3d Cir. 2016). Therefore, if there is no duty to defend then there is no duty to indemnify. Id.

In Pennsylvania, courts define the scope of coverage provided by the insurance policy and then determine whether the allegations of the complaint trigger coverage

---

[6] Both parties agree that Pennsylvania law applies to this case.

under the policy. Id. Pennsylvania follows the "four corners" rule in this context, limiting courts' inquiries only to the allegations of the complaint in the underlying action. Id. (citing Kvaerner, 908 A.2d at 896). In viewing the allegations in the complaint, courts construe them liberally in favor of the insured. Id. If there is any possibility that coverage has been triggered, the insurer has a duty to defend until it becomes clear that there is no possibility the insurer owes the insured a defense. Id. at 673–74.

## B. An "Occurrence" Under Pennsylvania Law

As stated above, the entire dispute in this case centers around whether there was an "occurrence" under the CGL policy. An "occurrence" is a commonly used term of art in many insurance contracts. Therefore, courts in Pennsylvania and the Third Circuit have frequently interpreted this term in attempts to delineate what does and does not fall within its definition.

The parties rely heavily on the seminal case Kvaerner Metals Division v. Commercial Union Insurance Company, 908 A.2d 888 (Pa. 2006), in which the Pennsylvania Supreme Court considered what constitutes an "occurrence" as a matter of law. Like here, the insurer in Kvaerner denied coverage on the basis that the underlying suit against its insured was not an occurrence. 908 A.2d at 891–92. The underlying suit against the insured (a manufacturing company) involved the design and construction of a coke oven battery. Kvaerner, 908 A.2d at 891. The plaintiff in the underlying action had contracted with the insured to have the insured build and design the battery. Id. The suit claimed the insured breached its contract because there were numerous defects in the battery. Id. Like the CGL here, the policy at issue in Kvaerner only provided coverage for

property damage caused by an "occurrence." Id. at 897. The policy in Kvaerner defined "occurrence" the same way the CGL policy here does: "an accident, including continuous or repeated exposure to substantially the same or general harmful conditions." Id.

Because the policy in Kvaerner did not define "accident," the Pennsylvania Supreme Court set out to do that. It held "that the definition of 'accident' required to establish an 'occurrence' under the policies cannot be satisfied by claims based upon faulty workmanship." Id. at 899. The Court reasoned that claims based upon faulty workmanship "simply do not present the degree of fortuity contemplated by the ordinary definition of 'accident' or its common judicial construction in this context." Id. Based on this holding, the Court concluded that the insurer had no duty to defend because the underlying claims were based on faulty workmanship to the work product itself. Id. at 900. Specifically, the Court relied on allegations that there were "construction defects" in the battery and that the battery did not meet the "contract specifications and warranties" agreed upon. Id.

Neither party disputes that Kvaerner made clear that an "occurrence" in a GCL policy cannot be satisfied by claims based upon faulty workmanship. QSV, however, attempts to distinguish Kvaerner from the instant case. In particular, QSV argues that Kvaerner dealt solely with damage to the insured's property (*i.e.* the coke oven battery). The situation here is different, according to QSV, because the claims against QSV relate not only to QSV's products but also allege damage to surrounding property. QSV's argument has been foreclosed by Pennsylvania case law directly addressing this issue.

Soon after <u>Kvaerner</u> was decided, the Pennsylvania Superior Court addressed whether there was an "occurrence" in a coverage dispute involving property damage and water infiltration in newly constructed houses. <u>Millers Capital Ins. Co. v. Gambone Bros. Dev. Co.</u>, 941 A.2d 706, 707–11 (Pa. Super. Ct. 2007), <u>appeal denied</u>, 963 A.2d 471 (Pa. 2008). The insured had contracted to build a housing development. <u>Id.</u> at 708. After the homes were built, the homeowners sued the insured when they "began to notice water leaks in their respective homes." <u>Id.</u> at 709. The claims alleged "construction defects and product failures in . . . the homes' vapor barriers, windows, roofs, and stucco exteriors." <u>Id.</u> The trial court granted summary judgment in favor of the insurer, finding no duty to defend since the underlying claims were based upon faulty workmanship. <u>Id.</u> (citing <u>Kvaerner</u>, 908 A.2d 888). On appeal, the Superior Court affirmed. <u>Id.</u> at 718.

Like QSV here, the insured in <u>Gambone</u> argued that the nature of the damage to the homes differed from the nature of the damage to the coke oven battery in <u>Kvaerner</u>. <u>Id.</u> at 713 ("Gambone argues the . . . actions do not merely involve claims for faulty workmanship . . . but also involve claims for ancillary and accidental damage caused by the resulting water leaks to non-defective work inside the home interiors."). However, the Superior Court expressly rejected this distinction and found no duty to defend. <u>Id.</u> In the process, the Court rested its decision upon what it found to be the central tenet of <u>Kvaerner</u>: the degree of fortuity contemplated by the terms "accident" and "occurrence" does not encompass claims for faulty workmanship. <u>Id.</u> at 713. It did not matter that there may be resulting damage to exterior property located outside of or apart from the insured's property. <u>Id.</u> The resulting damage, according to the Court, was a natural and

foreseeable result of the faulty workmanship, which does not qualify as an "accident."

Id.[7]

Since Kvaerner and Gambone, courts have consistently held that claims based upon faulty workmanship do not amount to an "occurrence" that triggers an insurer's duty to defend. See Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co., 609 F.3d 223, 231, 238–39 (3d Cir. 2010) (relying on Gambone in holding insurer had no duty to defend manufacturer-seller of synthetic turf against negligence and breach of warranty claims because "[f]aulty workmanship, even when cast as a negligence claim, does not constitute [an 'occurrence']"); Westfield Ins. Co. v. Bellevue Holding Co., 856 F. Supp. 2d 683, 702 (E.D. Pa. 2012) (finding no duty to defend because the underlying claims against the insured were "based entirely on claims of faulty workmanship"); Zurich Am. Ins. Co. v. R.M. Shoemaker Co., Civ. A. No. 12–873, 2012 WL 895451, at *2, *6 (E.D. Pa. Mar. 16,

---

[7] QSV acknowledges that Gambone "rejected the distinction . . . between [an insured's] own defective and non-defective work product." (Doc. No. 10-1 at 9). QSV nonetheless contends that the Superior Court in Gambone erred by misapplying Pennsylvania precedent. (Id. at 10). QSV argues that Gambone erroneously applied a foreseeability analysis to an insurance contract and that such an analysis is prohibited by Pennsylvania law. Although artfully crafted, QSV's argument proves unavailing. QSV relies on a decision issued twenty years earlier than Gambone, in which the Pennsylvania Superior Court interpreted a Pennsylvania Supreme Court case to preclude the application of a foreseeability analysis to insurance contracts. QSV further argues that Gambone cannot overrule this earlier Superior Court case. All this is moot, though, given the simple fact that the Pennsylvania Supreme Court denied the insured's appeal in Gambone. 963 A.2d 471. If QSV were correct—that Gambone represents a drastic departure from established Pennsylvania precedent—then the Pennsylvania Supreme Court presumably would have granted the appeal in Gambone. Accordingly, I must accept Gambone's precedential value as is. To do otherwise would subvert the authority of the Pennsylvania Supreme Court to pronounce the law of its own commonwealth.

Aside from this point, the Pennsylvania Supreme Court case QSV relies on is inapposite to the instant case. Cf. Mohn v. Am. Cas. Co. of Reading, 326 A.2d 346 (Pa. Super. Ct. 1974). In Mohn, the Pennsylvania Supreme Court addressed the term "accidental bodily injury" in the context of "medical insurance policies" after an insured individual was physically injured and denied coverage. 326 A.2d at 347. In that particular context, "the test of whether injury is a result of an accident is to be determined from the viewpoint of the insured and not from the viewpoint of the one that committed the act causing the injury." Id. at 348 (citing cases all of which dealt with injured individuals seeking insurance coverage as the result of physical injuries). Obviously, this concept could not apply to a coverage dispute like the one here because the viewpoint of the insured is the same as the viewpoint of the one who committed the act causing the injury; here, QSV is both the insured and the one who is alleged to have committed the act which caused the injury (i.e. the property damage to the condominiums). The cases relied on by QSV involve allegedly injured parties seeking coverage. These cases do not address the situation here, namely, where the accused is seeking coverage for a suit brought by the allegedly injured party.

2012) (relying on Gambone and Kvaerner for the proposition that "faulty workmanship by a contractor which results in damage to additional property of the other party to the underlying contract is not an 'occurrence'" and that "[w]ater damage is a foreseeable result of faulty workmanship" lacking in the "required 'degree of fortuity' for an occurrence to have taken place, even if couched in terms of negligence"); Bomgardner v. State Farm Fire & Cas., Civ. A. No. 10–1287, 2010 WL 3657084, at *4 (E.D. Pa. Sept. 14, 2010) (holding there was no duty to defend "[c]laims based on defective workmanship" and rejecting the alternative argument that the damaging results from the defective workmanship constitute an "occurrence"); Meridian Mut. Ins. Co. v. James Gilligan Builders, Civ. A. No. 08–1995, 2009 WL 1704474, at *6 (E.D. Pa. June 18, 2009) (finding no duty to defend claims of "defects in stucco application, sealing at the windows, doors, and other penetration points" because such claims were based on faulty workmanship); Peerless Ins. Co. v. Brooks Sys. Corp., 617 F. Supp. 2d 348, 356–57 (E.D. Pa. 2008) (finding no duty to defend against professional negligence, breach of contract, and breach of warranty claims that clearly constituted allegations of faulty workmanship per Kvaerner). To be sure, there is no "accident" and thus no "occurrence" even if the allegations of faulty workmanship are brought under the guise of a negligence claim. See Westfield, 856 F. Supp. 2d at 694 (collecting cases holding that the definition of "occurrence" does not include faulty workmanship "even when cast as a negligence claim").

Courts have distinguished claims for faulty workmanship from claims that an insured's product "actively malfunctioned." In the latter circumstance, courts have

concluded that there is a duty to defend based on the fortuity involved in the active malfunction of a product. See Kvaerner, 908 A.2d at 898 (noting that CGL policies provide coverage for damages that result from an insured's product actively malfunctioning but do not provide coverage for claims of faulty workmanship).

For example, in Indalex Inc. v. National Union Fire Insurance Company, the Pennsylvania Superior Court addressed claims that the insured's windows and doors were "defectively designed or manufactured." 83 A.3d 418, 419 (Pa. Super. Ct. 2013). The alleged defects resulted in water infiltration that caused property damage and physical injuries. Id. at 419–20. The plaintiffs in the underlying action brought strict liability, negligence, breach of warranty, and breach of contract claims. Id. at 420. The Indalex court found the insurer had a duty to defend these claims in large part because the claims were phrased in terms of a "bad product, which can be construed as an 'active malfunction,' and not merely bad workmanship." Id. at 424. The court recognized that this made the claims different from those in Gambone and Kvaerner, both of which alleged only faulty workmanship. Id.; see also Nat'l Fire Ins. Co. v. Robinson Fans Holdings, Inc., Civ. No. 10–1054, 2011 WL 1327435, at *3 (W.D. Pa. Apr. 7, 2011) ("[T]here is a discernible distinction between a product that actively malfunctions, which could give rise to an 'accident,' and flawed product-related work done in performance of a contract, which cannot."). While a negligence claim could (but might not) constitute an occurrence, Pennsylvania law is clear that CGL policies do not provide coverage for breach of contract and breach of warranty claims. Nationwide Mut. Ins. Co. v. CPB Int'l, Inc., 562 F.3d 591, 597–98 (3d Cir. 2009).

14

In light of the breadth of Pennsylvania and Third Circuit precedent, I conclude that the term "occurrence" in QSV and defendant's CGL policy excludes contractual claims for faulty workmanship. In the same vein, negligence claims that allege foreseeable damages stemming from faulty workmanship do not fall within the definition of "occurrence."

### C.    Defendant Has No Duty to Defend QSV in the Underlying Action

Having determined the scope of coverage provided by the policy, I must now "examine the underlying complaint to ascertain whether its factual allegations trigger coverage." Westfield, 856 F. Supp. 2d at 694. Defendant maintains it has no duty to defend QSV because all the underlying claims are based on faulty workmanship. QSV attempts to cast the underlying action as a tort-based product liability claim. A review of the underlying complaints, however, reveals that the claims are for faulty workmanship. Such claims are not "accidents" and thus not "occurrences" under the CGL policy. Accordingly, defendant has no duty to defend QSV.

### 1.    The Underlying Original Complaint

The claims asserted by the Heritage Creek Condominium Association against Mignatti only allege faulty workmanship based upon construction defects. Putting aside the legal conclusions in the amended complaint, its factual allegations consist of the following:

> Mignatti [was required] to complete the designated Improvements, including Improvements which are the subject of this action, according to the Township's standards and requirements . . . .

15

[Mignatti] had a duty to organize the Condominium association and to administer the affairs of the Condominium in accordance with the Pennsylvania Uniform Condominium Act, the Declaration of Condominium and the Bylaws of the Association . . . .

[Mignatti] had the duty and obligation to construct the Condominium in accordance with the Development Agreement, the approved Plans, the Pennsylvania Uniform Condominium Act, the Public Offering Statement and all applicable building codes and ordinances, and had a duty to oversee the construction and administration of the Condominium in good faith and in a fiduciary capacity . . . .

[N]umerous deficiencies, including, *inter alia*, serious fire, life and safety deficiencies in the construction of the furnace, ventilation, roofing, alarms, sprinklers, electrical and water systems throughout the Condominium . . . .

Many of the deficiencies . . . are in violation of the International Mechanical Code, International Plumbing Code, the BOCA Building Code, National Electrical Code and other applicable industry standards and regulations and zoning standards . . . .

[Mignatti] ha[s] not . . . completed or agreed to complete all of the repairs required in order for the Condominium to comply with all of the applicable codes and regulations . . . . [or] applicable zoning and other construction requirements.

(Doc. No. 1-4 ¶¶ 19, 23–24, 29–30, 36, 40).

The underlying complaint brought seven counts in support of the above averments. These counts contain allegations solely related to faulty workmanship. For example, the complaint alleges Mignatti is liable for failing to construct the condominium in accordance with contractual specifications, zoning and building code ordinances, private bylaws, the Pennsylvania Uniform Condominium Act, and the Pennsylvania Unfair Trade Practices and Consumer Protection Law. (Id. ¶¶ 44–46, 51, 54, 56, 61). According to the complaint, these construction failures also amount to a breach of fiduciary duty. (Id. ¶ 48).

16

Notably, not a single allegation in the underlying amended complaint comes close to averring an "active malfunction" in any product. Nor are there any allegations that even closely resemble a product-liability claim. To the contrary, all of the allegations are based upon Mignatti's alleged failure to build the homes as required by Mignatti's private contractual agreements, building codes, and zoning laws.

These claims merely allege faulty workmanship, which cannot constitute an occurrence under the CGL policy. Kvaerner, 908 A.2d at 899 ("[T]he definition of 'accident' required to establish an 'occurrence' under the policies cannot be satisfied by claims based upon faulty workmanship."). The fact that the underlying claims allege damages to more than QSV's work product itself does not change this result. See Gambone, 941 A.2d at 713 (finding "no merit in [this] distinction"); Specialty Surfaces, 609 F.3d at 239 (finding no duty because such ancillary damages are a "predictable" result of faulty workmanship and thus not accidental in nature); Bomgardner, 2010 WL 3657084, at *5 (same); Zurich, 2012 WL 895451, at *2, *6 (same). Nor does the fact that the underlying complaint included the word "negligence." Specialty Surfaces, 609 F.3d at 231.

The underlying complaint brought by Heritage Creek Condominium Association against Mignatti contains only allegations of faulty workmanship. Such claims do not trigger coverage under an "occurrence" policy because they lack the necessary fortuity to constitute an "accident."

## 2. <u>The Amended Joinder Complaint Against QSV</u>

The amended joinder complaint brought against QSV also contains allegations and damages solely based upon faulty workmanship. Nothing in the amended joinder complaint alleges that QSV's product actively malfunctioned.

Tort-based product liability claims allege inherent defects or danger in a product. The cause of the harm in such claims is a particular defect in the way the product itself was manufactured, designed, or marketed. With these considerations in mind, it is clear that none of the allegations in the amended joinder complaint sound in product liability. The allegations instead rest upon: (1) QSV's purported failure to properly "install" or "seal" its products; (2) QSV's purportedly "poor felt and flashing practices"; (3) breaches of duties "with respect to [QSV]'s work"; and (4) QSV's contractual undertakings. (Doc. No. 12-7 ¶¶ 16, 17, 22, 45–50). Improper installation, poor construction practices, and liability relating to the "work" a company performs clearly embody faulty workmanship—not product liability—claims. Such allegations do not contain the level of fortuity to qualify as an "occurrence." Similarly, claims based upon the parties' contractual undertakings cannot, as a matter of law, constitute an "occurrence" under a CGL policy. <u>E.g.</u>, <u>CPB</u>, 562 F.2d at 597–98.

Contrary to QSV's arguments, the allegations in the amended joinder complaint are nothing like those in <u>Indalex</u>, which were phrased in terms of a "bad product." 83 A.3d at 424. Indeed, the underlying allegations in <u>Indalex</u> explicitly stated that the insured's product was "defectively designed or manufactured." <u>Id.</u> at 419. Here, there are no such averments. In other words, the alleged damages in <u>Indalex</u> resulted from the fact

that the product was defective in some way. Here, and in other analogous cases, the

alleged damages resulted from allegations that QSV did not properly perform its work.

This distinction is crucial in the context of insurance coverage since only the former type

of claim triggers coverage. See, e.g., Robinson Fans Holdings, Inc., 2011 WL 1327435,

at *3 ("[T]here is a discernible distinction between a product that actively malfunctions,

which could give rise to an 'accident,' and flawed product-related work done in

performance of a contract, which cannot."). QSV is correct that, as shown in Indalex,

tort-based product liability claims brought against an insured may constitute an

occurrence. 83 A.3d at 425. Notwithstanding this, QSV's entire argument suffers from

the same fatal flaw throughout: the claims brought against QSV were based solely upon

an alleged contractual breach and faulty workmanship; none of the allegations state that

QSV's product (the stone veneer) was defective or actively malfunctioned.

  QSV also attempts to avoid the impact of Gambone, which stands for the

proposition that ancillary and resulting damages stemming from faulty workmanship do

not constitute an "occurrence." Specifically, QSV argues that because it is a

subcontractor-manufacturer and not a developer, Gambone does not apply. This argument

misses the mark. Gambone did not base its decision at all on the specific status of the

insured (e.g., a developer, subcontractor, general contractor). Rather, the court rested its

decision on the principle that when a claim alleges the work was performed improperly,

damages that naturally flow from that improper work are not transformed into

"occurrences" simply because they manifested at a later date and affected a different part

of the construction project. Subsequent case law only confirms this point.

19

In <u>Specialty Surfaces</u>, the insured (like QSV) was not a developer but rather a manufacturer-contractor. 609 F.3d at 227. Also like here, the alleged poor workmanship and installation in <u>Specialty Surfaces</u> resulted in ancillary water leakage. <u>Id.</u> at 228, 239. There, the court rejected the same argument QSV now makes. <u>Id.</u> at 239. In doing so, it explained that the central focus of <u>Gambone</u> is "on whether the alleged damage was caused by an accident or unexpected event, or was a foreseeable result of the faulty workmanship." <u>Id.</u> at 239. The insured's status as a non-developer did not preclude the court from finding the insurer had no duty to defend since the water leakage was a predictable result of the faulty work. <u>Id.</u>

Likewise, in <u>Zurich</u>, Judge Bartle relied on <u>Gambone</u> in finding that "faulty workmanship by a contractor which results in damage to additional property of the other party to the underlying contract is not an 'occurrence.'" 2012 WL 895451, at *2; <u>see also</u> <u>Meridian</u>, 2009 WL 1704474 (finding no duty to defend, even when the insured was a subcontractor who only installed the windows, because the claims were based upon faulty workmanship). [8]  It does not matter that the insured was a developer or a subcontractor. All that matters for the analysis is whether the insured performed the work that is alleged

---

[8] Recently, Judge Rufe found that an insured had no duty to defend a window subcontractor against claims of faulty workmanship when the complaint "did not only allege that [the subcontractor]'s work was deficient, but that its defective work caused damage to the work of others." <u>Lenick Construction, Inc. v. Selective Way Ins. Co.</u>, Civ. A. No. 14–2701, 2016 WL 1161571, at *4 (E.D. Pa. Mar. 23, 2016) (citing <u>Gambone</u>, 941 A.2d at 713). Judge Rufe emphasized that "where liability is premised upon poor workmanship, the fact that nearby work was also damaged does not change the analysis, so long as such damage is reasonably foreseeable." <u>Id.</u>

to have been faulty. The distinction QSV attempts to draw is not recognized by case law involving the duty to defend.[9]

In sum, the underlying claims against QSV are based solely on allegations of faulty workmanship. None of the allegations are product-liability based. Nor do they allege, in any way, that QSV's product (the stone veneer) actively malfunctioned. Rather, the allegations state that QSV did a poor job installing the stone veneer. Because such allegations, and the resulting damages, do not constitute a fortuitous "accident," there is no "occurrence" under the CGL policy.

### D.    Other Provisions of the Policy Do Not Trigger Coverage

QSV does not question that the CGL the policy at issue in this case only provides coverage if there is an occurrence. (Doc. No. 10-1 at 16) ("The Insuring Agreements of the Selective Policy provide broad coverage for sums that the insured becomes legally obligated to pay . . . caused by an occurrence"). Nevertheless, QSV argues that, when read together, the CGL's insuring agreement, products-completed operations hazard, and impaired property exclusion make clear that defendant must defend QSV.

The CGL policy provides different aggregate limits depending upon the type of damages. (Doc. No. 12-1 at 58). It provides a $2,000,000 general aggregate limit and a separate $2,000,000 aggregate limit for products-completed operations. The products-completed provision applies when bodily injury or property damage occurs "away from

---

[9] While stressing that it is a "product manufacturer," QSV omits the fact that QSV is also a subcontractor. QSV does not dispute that, as a subcontractor, it entered into an agreement not only to provide the stone veneer, but also to complete all the labor involved with the stone veneer (*i.e.* install the stone veneer at the condominium). (Doc. No. 1 at 19 ¶¶ 16–17). Thus, QSV cannot escape the fact that its workmanship is at issue in this case simply because it also manufactured the product that it installed.

21

premises [QSV] own[s] or rent[s] and arising out of '[QSV's] product' or '[QSV's work.'" (Id. at 84 ¶ 16(a)). On the other hand, if the damages occur at a premises that is owned or rented by QSV, then the general aggregate limit applies. (Id. at 61).

QSV correctly points out that, under the above language, the policy provides broad coverage for damages to others' property that arises out of QSV's products. Contrary to QSV's position, though, the broad language in the products-complete provision does not change the fact that there still must be an "occurrence" in order for any CGL coverage to apply. This is made clear by the CGL coverage form. (Doc. No. 12-1 at 70). The CGL coverage form explicitly and unambiguously states that defendant has "no duty to defend against any 'suit' seeking damages for . . . 'property damage' to which this insurance does not apply." (Id. ¶ 1(a)). The form also explicitly states that insurance applies only if the property damage is caused by an occurrence. (Id. ¶ 1(b)(1)). Therefore, while the CGL policy contains a separate aggregate limit for products-completed operations, that separate limit (like all the CGL's limits) only applies if there is an occurrence.

The court in Westfield Insurance Company v. Rustic Exteriors, Inc. confronted this identical issue. Civ. A. No. 11–6011, 2013 WL 12146532, at *7–8 (E.D. Pa. Mar. 21, 2013). There, the court found that the insurer had no duty to defend the insured because there was no "occurrence" under the policy. Rustic Exteriors, 2013 WL 12146532, at *7. In doing so, the court rejected the insured's reliance on the products-completed operations hazard. Id. at *7–8. It held: "[T]he plain, unambiguous language of the 'products-completed operation hazard' read in the context of the policy as a whole . . . does not alter the 'occurrence' coverage-triggering requirement in the policy but merely

clarifies what 'property damage' may be covered under the policy in certain circumstances." <u>Id.</u> at *7. In other words, simply because the products-completed operations hazard existed did "not change the fact that, under the policy, the covered 'property damage' (of which the 'products-completed operations hazard' is a part) must be '<u>caused by an</u>' accident-based 'occurrence.'" <u>Id.</u> at *8 (emphasis in original).

Like in <u>Rustic Exteriors</u>, the products-completed operations hazard in QSV's policy does not do away with the overall requirement that there is only coverage if there is an occurrence. Although QSV contends this renders the coverage moot, that is not the case. On the contrary, the separate aggregate limits for "general" and for "products-completed operations hazard" simply reflect the policy's intent to bifurcate coverage between damages that occur on QSV's own property versus damages that occur away from QSV's property.[10] Under either situation, the damages must be the result of an "occurrence" in order to trigger coverage.[11]

QSV argues that a full reading of the entire policy confirms its arguments. However, the opposite is true. A reading of the entire policy reveals that the products-completed operations hazard is subject to the CGL coverage limitations and, therefore, subject to the "occurrence" requirement. The policy's common declaration, for example,

---

[10] In the same vein, the "arising out of" language in the products-completed operations provision does not supplant the "occurrence" requirement. <u>Rustic Exteriors</u>, 2013 WL 12146532, at *8 n.13. The policy makes this clear by making all coverage related to property damage and bodily injury subject to the "occurrence" requirement. (Doc. No. 12-1 at 70).

[11] This is the case for the exclusions of the CGL policy as well. QSV relies on the policy's impaired property exclusion to argue that defendant has a duty to defend. The impaired property exclusion only excludes coverage for a certain type of damages. (Doc. No. 12-1 at 74, 83). According to QSV, because this exclusion does not exclude all damages to other property, it therefore follows that defendant has a duty to defend. This argument ignores the overarching requirement that is a prerequisite to all coverage under the CGL policy: an occurrence.

lists the schedule of coverage, which includes four separate types of coverage: (1) CGL coverage; (2) commercial automobile coverage; (3) commercial inland marine coverage; and (4) commercial umbrella coverage. (Doc. No. 12-1 at 39). Notably, the products-completed operations hazard is not its own affirmative grant of coverage but rather a provision within the CGL policy's coverage.[12] The CGL policy unambiguously requires an "occurrence" to trigger coverage.

## V.    CONCLUSION

For the foregoing reasons, I find that the allegations against QSV in the underlying action are based solely on claims of faulty workmanship. As a result, there is no "occurrence" under the policy. Since there is no occurrence, defendant has no duty to defend QSV. This result does not change even after taking into account all the provisions of the CGL policy. Accordingly, I will grant defendant's motion for summary judgment.[13]

An appropriate Order follows.

---

[12] This is frequently the case with CGL policies that contain a products-completed operations hazard. See, e.g., Wensel v. Nautilus Ins. Co., 474 F. App'x 862, 864 (3d Cir. 2012) (noting that "[t]he products completed-operations hazard provision, however, stands as a limitation . . . not an affirmative grant of coverage.").

[13] Because there is no duty to defend, it follows that there is no duty to indemnify. Sikirica, 416 F.3d at 225.